1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
                            AT SEATTLE

9

10   TILDEN-COIL CONSTRUCTORS,          CASE NO. C09-1574JLR
     INC.,

11                                      FINDINGS OF FACT,
                    Plaintiff,          CONCLUSIONS OF LAW, AND
12                                      ORDER ON MOTION FOR
            v.                          DETERMINATION OF
13                                      REASONABLENESS
     LANDMARK AMERICAN
14   INSURANCE COMPANY,

15                  Defendant.

16          This matter comes before the court on Plaintiff Tilden-Coil Constructors, Inc.'s

17   ("Tilden-Coil") motion (Dkt. # 78) for a determination of the reasonableness of its

18   settlement agreement with Westec Industries, Inc. ("Westec"), its adversary in an

19   underlying California lawsuit.  At oral argument on October 22, 2010, counsel for both

20   Tilden-Coil and Defendant Landmark American Insurance Company ("Landmark")

21   agreed that they would forgo a formal evidentiary hearing with live testimony from

22   witnesses and that the court would determine whether the settlement was reasonable

1   based on the parties' briefs and the accompanying declarations and exhibits.

2   Accordingly, having considered the submissions of the parties and the arguments of

3   counsel, the court makes its Findings of Fact and Conclusions of Law as follows.

4   **I.    PRELIMINARY MATTERS**

5   On October 28, 2010, following oral argument on Tilden-Coil's motion for a

6   determination of reasonableness, Tilden-Coil moved to supplement the record.  (Dkt. #

7   93.)  Tilden-Coil seeks to submit to the court a complete copy of Volume 1 of the

8   contract documents (the "Contract Documents") for the construction of Inland Empire

9   Regional Composting Facility (the "Project"), which contains the provisions upon which

10   Tilden-Coil relies in arguing that it was reasonable to include $611,424.00 in attorney's

11   fees in its settlement with Westec.  (*Id.*; *see* Oct. 2010 Irving Decl. (Dkt. # 94) Ex. A.)

12   Landmark opposes Tilden-Coil's motion.  (Dkt. # 99.)

13   The court observes that Tilden-Coil had ample opportunity to file the relevant

14   sections of the Contract Documents with both its original and renewed motions for a

15   determination of reasonableness.  Nevertheless, in the interest of determining the

16   reasonableness of the settlement on a complete record, and because Landmark had notice

17   of Tilden-Coil's argument and access to the Contract Documents in question and is

18   therefore not prejudiced, the court GRANTS Tilden-Coil's motion to supplement the

19   record (Dkt. # 94).

20   **II.    FINDINGS OF FACT**

21   1.    In September 2004, Tilden-Coil, the prime contractor for the construction

22   of the Project, hired Westec as a subcontractor to design and furnish a belt conveyor

system for the Project.  (Apr. 2010 Irving Decl. (Dkt. # 33) ¶¶ 3, 6.)  Tilden-Coil agreed to pay Westec $2,501,621.00 for the conveyor system.  (*Id.* Ex. A ("Purchase Order") at 1.)  Westec subcontracted the preparation of the metal surfaces of the conveyors to two subcontractors: Kipper & Sons Fabricators, Inc. ("Kipper") and Puget Sound Coatings.  (Sept. 2010 Christiansen Decl. (Dkt. # 80) ¶ 5.)

2.    Not long after the conveyors were installed, their coatings began to degrade.  (Apr. 2010 Irving Decl. ¶ 10.)  Tilden-Coil's coating expert, Barry Barman, determined that the coatings were delaminating due to poor surface preparation that did not conform to the standards specified in the contract between Tilden-Coil and Westec and he concluded that spot repairs of the coatings were not possible.  (Barman Decl. (Dkt. # 35) ¶¶ 15-17.)  Mr. Barman recommended that Tilden-Coil remove the conveyor system; sandblast the coatings from the entire system; and reapply the coatings.  (*Id.* ¶ 18 & Ex. B.)  Westec's own coating expert also found that the surfaces were not properly prepared before painting.  (*See* Sept. 2010 Christiansen Decl. Exs. E, F.)

3.    Tilden-Coil removed and repaired the conveyor system.  (Apr. 2010 Irving Decl. ¶ 11.)

4.    In early 2006, Tilden-Coil notified Westec that it intended to seek reimbursement for the costs it had incurred in repairing the conveyor system.  (Sept. 2010 Christiansen Decl. ¶ 7.)

5.    Westec had purchased a commercial general liability insurance policy from Landmark in early 2005.  (*Id.* ¶ 4.)  Westec notified Landmark of Tilden-Coil's claim for reimbursement and requested coverage under the policy.  (*Id.* ¶ 8.)  Landmark denied

1    coverage in a letter dated November 22, 2006.  (*Id.* Ex. A.)

2        6.    In March 2007, Tilden-Coil sued Westec, its subcontractors, and the paint

3    supplier, Rodda Paint, in California state court (the "California action").  (May 2010

4    Shanagher Decl. (Dkt. # 39) Ex. A.)  Westec asserted a counterclaim against Tilden-Coil

5    for $827,974.00, which Westec alleged was the unpaid balance of its subcontract.  (Sept.

6    2010 Christiansen Decl. ¶ 9.)

7        7.    Westec tendered the California action to Landmark, which denied the

8    tender in a letter dated December 20, 2007.  (Sept. 2010 Christiansen Decl. Ex. B.)

9    Landmark stated that it would not provide a defense because Westec's insurance policy

10   did not provide coverage for repair and replacement of materials furnished by Westec,

11   and, further, that exclusions in the policy barred "coverage for liability for damage to and

12   deficiencies of the insured contractor's work product."  (*Id.* at 10.)

13       8.    Thereafter, Westec defended itself in the California action at its own

14   expense.  (Sept. 2010 Christiansen Decl. ¶ 11.)  According to Westec's president, Ed

15   Christiansen, Westec could not afford an aggressive defense, could not send attorneys to

16   all of the depositions in the California action, could not pay its attorneys to analyze in

17   detail the documents Tilden-Coil produced in discovery, and could not hire certain

18   experts.  (*Id.* ¶ 12.)

19       9.    In October 2008, Tilden-Coil's insurance coverage counsel, Scott Turner,

20   wrote a letter to Landmark arguing that Westec's policy required Landmark to provide a

21   defense.  (May 2010 Shanagher Decl. Ex. B.)  The letter makes clear that Mr. Turner

22   represented Tilden-Coil and did not represent Westec.  (*See id.* at 1.)  Mr. Turner wrote

ORDER- 4

1   that Landmark unreasonably denied its duty to defend Westec.  (*See generally id.*)  Mr.

2   Turner also stated that it was likely that Westec would bring a bad-faith action against

3   Landmark.  (*Id.* at 7.)  He invited Landmark to attend an October 2008 mediation among

4   the parties to the California action, but Landmark did not attend the mediation.  (*Id.*)

5        10.     Trial in the California action was scheduled for April 6, 2009.  (Sept. 2010

6   Christiansen Decl. ¶ 13.)  On February 25, 2009, following a second letter from Mr.

7   Turner (May 2010 Shanagher Decl. Ex. C), Landmark reevaluated its coverage position

8   and agreed to defend Westec under a reservation of rights.  (Sept. 2010 Christiansen

9   Decl. Ex. C.)  Landmark retained counsel for Westec, agreed to reimburse Westec for the

10  attorney's fees and costs it had previously incurred in defending the California action,

11  and obtained a continuance of the trial date in the California action.  (*Id.*; May 2010

12  Shanagher Decl. ¶ 4; *see* Sept. 2010 Christiansen Decl. Ex. D ("1st Barger Letter") at 3.)

13       11.     Tilden-Coil settled its claim against Kipper for $650,000.00 and its claim

14  against Rodda Paint for $25,000.000.  (Apr. 2010 Irving Decl. ¶ 14.)

15       12.     In a June 2009 letter to Mr. Christiansen, Glenn Barger, Westec's

16  Landmark-appointed counsel, explained that "the failure to meet [the contract]

17  specification, both in terms of substrate preparation, inspection of the substrate prior to

18  painting, and painting itself, has resulted in damages for which we believe our client will

19  be found liable" and that even if some liability could be shifted to Kipper for failure to

20  meet the specifications, "it is clear that Westec did not determine that the [surface

21  preparation] was done properly."  (1st Barger Letter at 6.)

22       13.     Mr. Barger wrote a second letter to Mr. Christiansen in August 2009.

ORDER- 5

(Sept. 2010 Christiansen Decl. Ex. I ("2nd Barger Letter").)   Shortly before Mr. Barger

wrote the August 2009 letter, Tilden-Coil had offered to settle its remaining claims

against Westec for $900,000.00 plus Westec's agreement to waive its $827,974.00

counterclaim.  (*Id.* at 2.)  Mr. Barger noted that Tilden-Coil's total alleged damages at

that point equaled about $3.1 million.  (*Id.* at 2.)  Mr. Barger stated that he believed

> at best the plaintiff's alleged damages will be reduced 10% to 20% for the
> paint failures or approximately $200,000.00 - $400,000.00.   We also
> believe an agreement can be made that they are not entitled to attorney's
> fees thereby further reducing their claim, if we are successful.   We believe
> any claims of interest may also be subject to attack.   Our client would be
> entitled to a set-off of the other parties' settlements totaling approximately
> $700,000.00.   Finally, our client's affirmative claim leaves a net potential
> exposure totaling close to the $900,000.00 demand.

(*Id.* at 3.)  In other words, according to his August 2009 letter, Mr. Barger believed that

Westec could reduce or eliminate Tilden-Coil's claims for attorney's fees and interest in

addition to reducing the amount of the paint failure damages by $200,000.00 to

$400,000.00.  The court therefore does not credit Tilden-Coil's representation that Mr.

Barger believed that a total reduction of $200,000.00 to $400,000.00 (or 10% to 20%) of

damages was possible.  Rather, the court finds that Mr. Barger's letter supports a

conclusion that he believed that a greater reduction of damages was possible.

      14.    Before the end of 2009, Tilden-Coil and Westec attempted to mediate four

times.  (Sept. 2010 Christiansen Decl. ¶ 16; Irving Decl. ¶ 16.)  By this point, Westec was

nearly insolvent.  (Sept. 2010 Christiansen Decl. ¶ 16.)

      15.    In December 2009, Tilden-Coil and Westec entered into a covenant

judgment settlement agreement.  (Apr. 2010 Irving Decl. Ex. E ("Stip. for Entry of

1  Judgment") at Ex. A ("Settlement Agreement").)  The parties negotiated the settlement

2  over the course of eight weeks.  Both sides made multiple offers.  (*See* Apr. 2010 Irving

3  Decl. ¶ 18; Sept. 17, 2010 Hayes Decl. (Dkt. # 86) Ex. A (settlement letters between

4  Tilden-Coil and Westec).)  Landmark and Mr. Barger did not participate in these

5  negotiations.  As part of the settlement, Westec (1) stipulated to a $1,803,244.00

6  judgment comprised of $1,191,820.00 in damages and $611,424.00 in attorney's fees, (2)

7  agreed to drop its counterclaim against Tilden-Coil, (3) and assigned its bad faith and

8  contract rights against Landmark to Tilden-Coil.  (Settlement Agreement ¶¶ II.2-3.)

9       16.    Tilden-Coil contends that it was claiming over $3.8 million in damages

10  from Westec at the time of the settlement, including the following:

11       (a)    $2,566,470.00 in total costs to repair Westec's defective work,

12  which included (1) $1,610,197.00 paid to subcontractors; (2) $68,805.00 in "direct

13  costs, supervision, labor re repairs;" (3) $424,800.00 in "extended overhead;" (4)

14  $154,003 in "costs to complete Westec work;" and (5) $308,665 in "general

15  correction costs re Westec work";

16       (b)    a 10% "fee on repairs" totaling $256,647.00;

17       (c)    $389,054.00 in interest; and

18       (d)    $611,424.00 in legal expenses, including attorney's fees incurred in

19  the California action.

20  (Apr. 2010 Irving Decl. ¶ 14 & Ex. D (summarizing Tilden-Coil's damages as of October

21  2009).)

22       17.    Tilden-Coil agreed to offset these damages by Westec's $827,974.00

1    counterclaim and $675,000.00 it had received in settlements with other parties, leaving

2    approximately $2.3 million in claimed damages.  (*Id;* Settlement Agreement ¶ II.2.)

3    Tilden-Coil states that during settlement negotiations it also gave up its claim for interest

4    plus half of its 10% "fee on repairs" for a total reduction of approximately $517,000.00,

5    or 22.3% of its post-offset damages.  (Apr. 2010 Irving Decl. ¶ 19.)  Tilden-Coil agreed

6    to execute the judgment only against Westec's liability insurance.  (Settlement

7    Agreement ¶ II.3.)

8         18.    In March 2010, Tilden-Coil filed a motion in the California action for a

9    determination of good-faith settlement pursuant to California Code of Civil Procedure §

10   877.6(c).  (Apr. 2010 Irving Decl. Ex. F.)  Landmark intervened in opposition, arguing, in

11   part, that Tilden-Coil had no contractual right to recover the attorney's fees it incurred in

12   the litigation with Westec.  (*Id.* Ex. G at 6-7.)  The California judge granted the motion

13   for determination of good faith settlement and for entry of the stipulated judgment.[1]  (*Id.*

14   Ex. H.)  The California judge noted that Tilden-Coil had "the better argument" regarding

15   the inclusion of attorney's fees in the settlement and that, "at a minimum, Landmark has

16   not convincingly demonstrated that attorney's fees is not a legitimate element of the

17   settlement between Westec and Tilden-Coil."  (*Id.* at 8.)  The court therefore held that

18
_____

19        [1] Tilden-Coil does not contend that the California court's determination of good faith has
     preclusive effect in the current litigation, but rather that it is evidence supporting a finding that
20   the settlement was reasonable. The court agrees with Tilden-Coil's characterization of the
     California court's determination.  In contrast to Washington law, which places the burden on the
21   settling parties to prove that a settlement was reasonable, *Mut. of Enumclaw Ins. Co. v. T&G
     Constr. Inc.*, 199 P.3d 376, 382 (Wash. 2008), under California law a party asserting a lack of
22   good faith bears the burden of proof on that issue. Cal. Code. Civ. Proc. § 877.6(d).  Therefore,
     the court takes the California court's determination of good faith settlement only as evidence of
     the parties' good faith.

1  Landmark had not met its burden to demonstrate that the settlement was in bad faith.  (*Id.*

2  at 8.)  The California trial court did not, however, have the relevant contract language

3  before it.  (*See* Apr. 2010 Irving Decl. Exs. F & G.)  The court does not, therefore, place

4  great weight on the California trial court's statements regarding the inclusion of

5  attorney's fees in the settlement amount.

### III.   CONCLUSIONS OF LAW

7       1.       In Washington, the amount of a covenant judgment is the presumptive

8  measure of an insured's damages when the insurer declines to participate in the liability

9  lawsuit, even in the absence of bad faith, provided the court finds that the settlement was

10  reasonable under the factors set forth in *Chaussee v. Maryland Casualty*, 803 P.2d 1339

11  (Wash. Ct. App. 1991).  *Mut. of Enumclaw Ins. Co. v. T&G Constr. Inc.*, 199 P.3d 376,

12  382 (Wash. 2008) (citing *Besel v. Viking Ins. Co. of Wis.*, 40 P.3d 887, 891 (Wash.

13  2002)).  The *Chaussee* factors are as follows:

> (1) the releasing person's damages; (2) the merits of the releasing party's
> liability theory; (3) the merits of the released party's defense theory; (4) the
> released party's relative fault; (5) the risks and expenses of continued
> litigation; (6) the released party's ability to pay; (7) any evidence of bad
> faith, collusion, or fraud; (8) the extent of the releasing party's investigation
> and preparation; and (9) the interests of the parties not being released.

*Mut. of Enumclaw*, 199 P.3d at 381.  "No one factor controls and the trial court has the

discretion to weigh each case individually."  *Chaussee*, 803 P.2d at 1343.  The insured

bears the burden of demonstrating that the settlement was reasonable.  *Id.*  "Washington

courts have found a trial court's reasonableness determination to be valid even when the

trial court fails to list any of the *Chaussee* factors, instead simply mentioning that the

parties addressed the factors in their briefs and the trial court considered the briefs." *Water's Edge Homeowners Ass'n v. Water's Edge Assoc.'s*, 216 P.3d 1110, 1118 (Wash. Ct. App. 2009) (citing *Martin v. Johnson*, 170 P.3d 1198, 1203 (Wash. Ct. App. 2007)).

2.      Having considered the facts found above, and having evaluated the nine *Chaussee* factors, the court concludes that Tilden-Coil has not met its burden to demonstrate that the settlement amount of $1,803,244.00 was reasonable.  The parties' dispute focuses primarily on two of the *Chaussee* factors:  (1) whether the settlement was reached through bad faith, collusion, or fraud; and (2) the amount of Tilden-Coil's damages.  The remaining factors either favor a finding that the settlement was reasonable or are neutral.

## A.      Evidence of Bad Faith, Collusion, or Fraud

1.      Under the eighth *Chaussee* factor, the court must consider "any evidence of bad faith, collusion, or fraud."  *Mut. of Enumclaw*, 199 P.3d at 381.

2.      The parties dispute whether Tilden-Coil or Landmark bears the burden with respect to this factor.  Tilden-Coil contends that Landmark has the burden to show the settlement was the product of fraud and collusion.  Landmark contends that the burden to demonstrate that the settlement was reasonable remains with the settling parties.  The court agrees with Landmark.

3.      Tilden-Coil cites *Besel*, 49 P.3d at 892 for the contention that Landmark bears the burden to show the settlement was the product of fraud and collusion.  In *Besel*, Mr. Ralston crashed his car into a tree, injuring his passenger, Mr. Besel.  *Id.* at 889.  Mr. Besel and Mr. Ralston eventually settled for an amount greater than the insurance policy

1  limits and entered into a covenant judgment in which Mr. Ralston assigned his claims

2  against his insurer to Mr. Besel.  *Id.*  The judge in the liability action determined that the

3  settlement was reasonable under *Chaussee*.  *Id.*  In Mr. Besel's later coverage action

4  against the insurer, the court limited any award of damages for the insurer's bad faith to

5  the contractual policy limit.  *Id.* at 890.  Mr. Besel appealed.  The Washington Supreme

6  Court held that "the amount of a covenant judgment is the presumptive measure of an

7  insured's harm caused by an insurer's tortious bad faith if the covenant judgment is

8  reasonable under the *Chaussee* criteria."  *Id.* at 891.  The court further observed that the

9  trial court in the liability action had specifically addressed the *Chaussee* criteria, and that,

10  "[o]nce the court determined the covenant judgment was reasonable, the burden shifted to

11  [the insurer] to show that the settlement was the product of fraud or collusion."  *Id.* at

12  892.

13       4.     Tilden-Coil takes this last sentence out of context.  As the Washington

14  Court of Appeals explained in *Water's Edge*, 216 P.3d at 1122-23, *Besel* dealt with a

15  settlement that the trial court had already found reasonable, and the burden of proving

16  bad faith shifted to the insurer only after the parties to the settlement had established its

17  reasonableness.  *Id.* at 1122.  In the original *Chaussee* analysis, however, the court

18  considers "merely whether there is any evidence of bad faith, collusion, or fraud," and the

19  burden is on the parties to the settlement to prove that their settlement was reasonable.

20  *Id.* at 1122-23.

21       5.     Here, the court concludes that there is no evidence of bad faith, collusion,

22  or fraud in the making of Tilden-Coil's and Westec's settlement.

ORDER- 11

1    6.    Landmark contends that the following demonstrate collusion: (1) Westec

2 was provided a covenant not to execute, so that it had no incentive to negotiate a lower

3 settlement; (2) Tilden-Coil hired Mr. Turner to write coverage letters on Westec's behalf;

4 (3) certain emails were exchanged between the original mediator in the case, Michael

5 Bayard, and Tilden-Coil before Landmark accepted Westec's defense and after he was

6 replaced by a new mediator; and (4) Tilden-Coil agreed to settle with Kipper for less than

7 its insurance policy limits.

8    7.    The court does not find that these facts rise to evidence of bad faith,

9 collusion, or fraud.

10    8.    First, the fact that Westec received a covenant not to execute does not, on

11 its own, demonstrate collusion.  Although Washington courts have recognized that a

12 covenant judgment may lead to a risk of collusive settlements, the requirement of a

13 *Chaussee* hearing protects insurers from the risk of excessive judgments in these

14 circumstances.  *See Besel*, 49 P.3d at 891-92.

15    9.    With respect to Landmark's second and third arguments, the court observes

16 that Tilden-Coil's efforts in the California action, while aggressive, were not made in bad

17 faith and were not collusive or fraudulent.  As discussed above, Tilden-Coil had suffered

18 significant financial damages as a result of the defective belt conveyors.  Meanwhile,

19 Landmark had repeatedly refused to indemnify or to defend Westec since late 2006, and

20 Westec's ability to satisfy a judgment was limited.  It is therefore reasonable that

21 Westec's right to proceed against Landmark in a future bad-faith action would be an

22 important factor in the parties' settlement discussions both before and after Landmark

1    agreed to provide Westec with a defense.  It is similarly reasonable for Tilden-Coil to

2    attempt to persuade Landmark that coverage for Westec's claims existed under the

3    Policy.  In addition, Mr. Bayard's email communications with Tilden-Coil do not

4    demonstrate collusion between Westec and Tilden-Coil.  The court does not, therefore,

5    find these efforts to be evidence of bad faith, collusion, or fraud.

6         10.     Finally, although Landmark argues that Tilden-Coil should have pressed to

7    recover the full $1 million insurance limit from Kipper rather than settle for $650,000.00,

8    the court does not find the Kipper settlement to be evidence of bad faith, collusion or

9    fraud.  The $650,000.00 settlement amounted to two-thirds of Kipper's available

10   insurance, and Kipper continued to contest liability.  (*See* 2nd Barger Letter at 3.)

11        11.     For these reasons, the court concludes that the settlement was not entered

12   into in bad faith or as a result of collusion or fraud.

13   **B.    Amount of Damages**

14        1.      The first *Chaussee* factor is the amount of the releasing person's damages.

15   *Mut. of Enumclaw*, 199 P.3d at 381.  The court concludes that Tilden-Coil has not met its

16   burden to demonstrate that its damages calculation was reasonable.

17        <u>Attorney's Fees</u>

18        2.      Tilden-Coil has not met its burden to show that it was reasonable to include

19   attorney's fees of $611,424.00 in the settlement amount.  The Settlement Agreement

20   states that attorney's fees and costs are "taxable against Westec pursuant to Cal. Code of

21   Civ. Pro. § 1033.5(a)(10) and Section 6.4, paragraph C.1 of the Prime Contract."

22   (Settlement Agreement at 4 ¶ 2.)  The court concludes that the cited provisions are not

ORDER- 13

1   reasonably interpreted as requiring Westec to pay Tilden-Coil the attorney's fees that

2   Tilden-Coil incurred in the underlying litigation.

3       3.      The parties agree that California law governs the interpretation of the

4   contract between Westec and Tilden-Coil.  The California statute cited in the Settlement

5   Agreement provides that a prevailing party may recover attorney's fees as costs in any

6   action or proceeding only when such an award is authorized by contract, statute, or law.

7   Cal. Code Civ. Pro. § 1033.5(a)(10).  Tilden-Coil argues that recovery of the attorney's

8   fees it incurred in the underlying litigation was authorized by an express provision of the

9   Contract Documents. The court must determine, therefore, whether it was reasonable for

10  the parties to interpret the Contract Documents to entitle Tilden-Coil to recover its

11  attorney's fees.

12      4.      In California, ordinary rules of contract interpretation apply when

13  interpreting attorney's fees clauses.  *Santisas v. Goodin*, 951 P.2d 399, 405 (Cal. 1998).

14  Thus, "[a] contract must be so interpreted as to give effect to the mutual intention of the

15  parties as it existed at the time of contracting, so far as the same is ascertainable and

16  lawful."  Cal. Civ. Code § 1636.  "The whole of a contract is to be taken together, so as to

17  give effect to every part, if reasonably practicable, each clause helping to interpret the

18  other."  *Id.* § 1641. "The words of a contract are to be understood in their ordinary and

19  popular sense, rather than according to their strict legal meaning; unless used by the

20  parties in a technical sense, or unless a special meaning is given to them by usage, in

21  which case the latter must be followed."  *Id.* § 1644.  "Thus, if the meaning a layperson

22  would ascribe to contract language is not ambiguous, [courts] apply that meaning."

1   *Santisas*, 951 P.2d at 405; *see also Reudy v. Clear Channel Outdoors, Inc.*, 693 F. Supp.

2   2d 1091, 1097 (N.D. Cal. 2010).

3        5.     Here, the Purchase Order signed by the presidents of Westec and Tilden-

4   Coil states that it encloses several exhibits, including "Exhibit 'H' regarding contract

5   documents."  (Apr. 2010 Irving Decl. Ex. A at 2 ¶ 14.)  Exhibit H incorporates certain

6   master contract documents into the agreement between Westec and Tilden-Coil.  (*Id*.;

7   Oct. 2010 Irving Decl. (Dkt. # 94) Ex. A ("Contract Documents") ¶ 3.5 (providing that

8   the terms of the prime contract are incorporated into each subcontract).)  Volume 1 of the

9   Contract Documents includes Paragraph 6.4(C), regarding "Covering and Uncovering

10  Work":

11      C.    Uncovering Work at Engineer's Request:  If the engineer considers
          it necessary or advisable that covered work be observed by the
12            engineer or inspected or tested by others, the Contractor, at the
          engineer's request, shall uncover, expose, or otherwise make
13            available for observation, inspection, or testing, as the engineer may
          require, that portion of the work in question, furnishing all necessary
14            labor, material and equipment.

15      1.    If it is found that such work is defective, *the Contractor shall*
          *bear all direct, indirect and consequential costs of such*
16            *uncovering, exposure, observation, inspection and testing and*
          *of satisfactory reconstruction, (including but not limited to*
17            *fees and charges of engineers, architects, attorneys and other*
          *professionals)*, and the Authority shall be entitled to an
18            appropriate decrease in the contract price, and, if the parties
          are unable to agree as to the amount thereof, the Contractor
19            may make a claim therefore as provided in therefore in
          accordance with [sic] the General Conditions (Part 2, Section
20            I), Paragraph 5.6, "Claims".

21  (Contract Documents ¶ 6.4 (emphasis added).)

22       6.     Tilden-Coil argues that it was reasonable for Westec and Tilden-Coil to

1  interpret Paragraph 6.4(C) as authorizing Tilden-Coil to recover from Westec all of the

2  attorney's fees incurred in the course of litigation to enforce the contract.  Having

3  reviewed the balance of the contract and the governing law, the court disagrees.

4       7.    First, Paragraph 6.4(C) provides that if "covered work" is found defective,

5  the Contractor (here, Westec[2]) is responsible for all "direct, indirect and consequential

6  costs" of "uncovering, exposure, observation, inspection and testing and of satisfactory

7  reconstruction," including fees and charges of attorneys.  (*Id.*)  This provision says

8  nothing about costs incurred in litigation to enforce the contract, but rather provides for

9  the recovery of costs incurred in completing the specific tasks listed.

10       8.    Second, Paragraph 6.4(C) provides that if the parties cannot agree on the

11  amount of the costs, the Contractor can make a claim to the Authority (here, Tilden-Coil)

12  pursuant to Paragraph 5.6 of the contract's General Conditions.  (*Id.*)  Paragraph 5.6

13  defines a process for resolving disagreements regarding these costs; it, like Paragraph

14  6.4(C), says nothing about costs incurred in litigation to enforce the contract.  (*See*

15  Contract Documents ¶ 5.6.)

16       9.    Third, other sections of the Contract Documents expressly provide for

17  recovery of attorney's fees and incurred in litigation under specific circumstances.   For

18  example, Paragraph 6.7(C) of the contract's General Conditions states that if a contractor

19  does not comply with its duty to correct or replace work found defective within one year

20

21  _____

22     [2] For purposes of interpreting the Contract Documents, Westec steps into the shoes of the "Contractor" and Tilden-Coil steps into the shoes of the "Owner" or "Authority."  (*See* Apr. 2010 Irving Decl. Ex. A, at Ex. H.)

of acceptance,

> the Authority shall be entitled to recover from the Contractor, in addition to all other amounts found due and owing, costs of suit and expenses including, but not limited to, fees of the engineers, architects, attorneys and other professionals and court and arbitration costs, arising directly, indirectly or consequential out of any action, legal or equitable, caused by the successful enforcement of the Contractor's obligations, all to be taxed as costs and included in any judgment rendered.

(Contract Documents ¶ 6.7(C).)  Thus, viewing the Contract Documents as a whole, *see* Cal. Civ. Code. § 1641, the court concludes that the drafter of the Contract Documents knew how to draft an unambiguous contract provision that provides, expressly and in detail, for the recovery of attorney's fees incurred in litigation to enforce the contract.

10.    Finally, even if Paragraph 6.4(C) could be interpreted as providing for recovery of attorney's fees incurred in litigation to enforce the contract, Tilden-Coil has provided the court with no invoices or other evidence supporting a finding that it incurred $611,424.00 in attorney's fees in the California action.

11.    For these reasons, the court concludes that it was unreasonable for the parties to include $611,424.00 in attorney's fees and costs incurred by Tilden-Coil in the California action in the settlement amount.

Other Elements of Damages

12.    Landmark also challenges Tilden-Coil's inclusion of a 10% "fee on repairs" totaling $256,647.00, and "extended overhead" of $424,800.00 in its estimate of damages.

13.    Tilden-Coil's president, Dean Irving, testified that he "felt that we were entitled to overhead and profit for a fee for conducting all this work" to complete the

ORDER- 17

1   repairs to the conveyor system.  (Sept. 17, 2010 Hayes Decl. Ex. D ("Irving Dep.") at

2   123.)  Thus, the 10% "fee on repairs" reflects profit to Tilden-Coil on the additional work

3   performed, rather than a "direct, indirect [or] consequential cost[] of such uncovering,

4   exposure, observation, inspection and testing and of satisfactory reconstruction."

5   (Contract Documents ¶ 6.4.)  The court therefore concludes that there are serious

6   questions regarding whether the "fee on repairs" is a legitimate element of damages.

7   Tilden-Coil, however, reduced its "fee on repairs" by 50% in the course of settlement

8   negotiations.  (Apr. 2010 Irving Decl. ¶ 17.)  The court finds that it was reasonable for

9   the parties to agree to a 5% "fee on repairs" to resolve this uncertainty.

10         14.      Mr. Irving also explained that "extended overhead" reflected the additional

11  on-site overhead Tilden-Coil incurred for the paint corrections.  (Irving Dep. at 123.)

12  Tilden-Coil states that "[t]hese damages were recoverable under the contract and

13  California law, and Landmark has cited no authority otherwise."  (Reply (Dkt. # 85) at

14  10.)  The court reminds Tilden-Coil that it, not Landmark, bears the burden of

15  demonstrating to the court that the settlement was reasonable.  *Chaussee*, 803 P.2d at

16  1343.  Tilden-Coil has not explained to the court how it calculated "extended overhead;"

17  has not directed the court to any provisions of the contract or of California law that may

18  be read as entitling it to recovery of "extended overhead;" and has submitted no invoices,

19  billing statements, or other documentation supporting its assertion that it incurred

20  $424,800.00 in "extended overhead."  The court therefore finds that Tilden-Coil has not

21  met its burden of demonstrating that it was reasonable to include "extended overhead"

22  charges of $424,800.00 in its calculation of damages.

1  **C.     Remaining *Chaussee* Factors**

2        1.      The court concludes that the remaining *Chaussee* factors are either neutral

3  or favor a finding that the settlement was otherwise reasonable.

4        2.      With respect to the second and third *Chaussee* factors, the merits of the

5  releasing party's liability theory and the released party's defense theory, there was little

6  dispute that Westec would be found liable for failure to meet the contract specifications

7  and for not inspecting its subcontractors' work; Westec's defense focused on the amount

8  of damages and on the portion of liability that could be attributed to its subcontractors.

9  (*See* 1st Barger Letter at 6; Sept. 2010 Christiansen Decl. Exs. E, F.)

10        3.      The fourth and ninth *Chaussee* factors, relative fault and the interests of the

11 parties not being released, apply when a court is determining the reasonableness of a

12 settlement between one or more codefendants and the plaintiff that has the effect of

13 casting liability on a non-settling codefendant.  These factors are not relevant here.

14 Tilden-Coil had already settled with the other defendants before Tilden-Coil and Westec

15 entered into their settlement, and there were, therefore, no other parties to the litigation

16 whose interests would be affected by the settlement.

17        4.      The fifth and sixth *Chaussee* factors, the risks and expenses of continued

18 litigation and the released party's ability to pay, favored settlement.  Westec risked

19 spending significant resources on the trial where only the amount, rather than the fact, of

20 liability was in doubt.  In addition, the parties do not dispute that Westec would not have

21 been able to pay a judgment in favor of Tilden-Coil had the parties not settled.  (*See* Sept.

22 2010 Christiansen Decl. ¶ 16.)

5.    With respect to the eighth *Chaussee* factor, the extent of the releasing party's investigation and preparation, the record demonstrates that Tilden-Coil performed a thorough investigation of the causes of the damage to the conveyor system, retained experts, conducted discovery, and otherwise prepared thoroughly for trial.  (*See, e.g.*, Apr. 2010 Irving Decl. ¶ 24.)  This factor demonstrates that Tilden-Coil was prepared to go to trial if the parties did not settle the California action.

6.    In sum, having reviewed the *Chaussee* factors, the court concludes that Tilden-Coil has not met its burden to show that the settlement amount of $1,803,244.00 was reasonable.  The court finds that it was not reasonable for the parties to interpret the Contract Documents between Tilden-Coil and Westec to provide for prevailing party's attorney's fees of $611,424.00, and Tilden-Coil did not demonstrate that it was reasonable to include $424,800.00 in "extended overhead" in its calculation of damages.

## IV.   ORDER

For the foregoing reasons:

1.    The court DENIES Tilden-Coil's motion for a determination of reasonableness (Dkt. # 78).

2.    The court ORDERS that the reasonable settlement amount, which serves as the presumptive measure of Tilden-Coil's damages if it prevails in this action, *Mut. of Enumclaw*, 199 P.3d at 382, is reduced by $1,036,224.00 to $767,020.00.

//

//

//

1    Dated this 25th day of February, 2011.

2

3

4    _____
     JAMES L. ROBART
5    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 21